Filed 10/4/22 Playboy Enterprises v. Indian Harbor Insurance CA2/1

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION ONE

| | |
|---|---|
| PLAYBOY ENTERPRISES, INC., | B315763 |
| Plaintiff, Cross-defendant and Respondent, | (Los Angeles County Super. Ct. No. 18STCV01214) |
| v. | |
| INDIAN HARBOR INSURANCE COMPANY, | |
| Defendant, Cross-complainant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Jon R. Takasugi, Judge. Affirmed.

Sinnott, Puebla, Campagne & Curet and Randolph P. Sinnott for Defendant, Cross-complainant and Appellant.

Eisner, Amber D. Henry and Zachary Elsea for Plaintiff, Cross-defendant and Respondent.

———————————————

Through the instant appeal, appellant Indian Harbor Insurance Company (Indian Harbor) raises a single issue: whether the trial court erred in concluding that a May 10, 2016 email between nonparty Elliott Friedman and respondent Playboy Enterprises, Inc. (Playboy) constitutes a "claim" by Friedman against Playboy for the purposes of a claims-made insurance policy Indian Harbor issued to Playboy. If the email was a claim, then it was made outside the policy period, and the policy would not cover the amount Indian Harbor advanced, under a reservation of rights, to settle the dispute between Playboy and Friedman.

We hold the trial court correctly concluded the email was not a "claim" as that term is defined in the policy. Rather than demanding money or nonmonetary relief of the type a court might order, Friedman's email requested a meeting with Playboy. Accordingly, we affirm.

## FACTS AND PROCEEDINGS BELOW

### A.     *Indian Harbor Insurance Policy*

Indian Harbor issued a claims-made-and-reported "professional liability insurance policy" (capitalization omitted) to Playboy with a policy period of November 30, 2016 to July 1, 2018 (the policy). Subject to other terms and conditions, the policy obligates Indian Harbor to pay, inter alia, "expenses and damages that [Playboy] is legally obligated to pay because of liability imposed by law or assumed under a written, oral, implied or express contract *as the result of a claim first made against* [*Playboy*] *during the policy period*" (italics added) alleging "a technology and professional services wrongful act committed by [Playboy]." (Boldface omitted & italics added.) Thus, a threshold requirement under the policy is that the payments for which

2

Playboy seeks coverage have been made as a result of a claim first made sometime between November 30, 2016 to July 1, 2018.

The policy exclusively defines "claim" as any of the following: (1) "A written demand for monetary damages, services, or injunctive or other non-monetary relief"; (2) "a civil proceeding for monetary damages, services, or injunctive or other non-monetary relief"; (3) a mandatory arbitration or other alternative dispute resolution proceeding "for monetary damages, services, or injunctive or other non-monetary relief"; (4) a subpoena served on Playboy "seeking in whole or part the production of documents or information with respect to which the [i]nsured claims a constitutional or statutory newsgathering privilege." The policy does not define "demand." The policy defines "damages" as "[c]ompensatory damages resulting from a judgment, award or settlement agreement" as well as, under certain circumstances, "[p]unitive, exemplary damages and multiple damages." The policy does not define "injunctive or other non-monetary relief."

A claim is deemed made on the date it is served on Playboy, if applicable, or on the date Playboy's "Legal Department or Risk Management Department" receives the claim.

### B. *Friedman's Dispute with Playboy and Resulting Settlement*

Playboy licenses Playboy's name, images, trademarks and artwork for a wide range of consumer products. In late 2012, businessman Elliott Friedman began talking to Playboy about potential licensing arrangements in Asia, including one for Playboy-branded beer and one for Playboy-branded cigarettes. These plans led to two separate contracts between two entities affiliated with Friedman—for the cigarette venture, Playboy Lifestyle Pte., Ltd. (Playboy Lifestyle), and for the beer venture, Eight Cup Limited

(Eight Cup)—and Playboy/Playboy-affiliated entities.  By 2014, plans for both arrangements fell apart.

### 1.    *Communications before the policy period regarding the Playboy-Friedman dispute*

On April 19, 2016, Friedman emailed Playboy's then-general counsel, Rachel Sagan.  Friedman wrote, "I am back in the LA area and thought it a good time to resolve the open issues with [Playboy]."  In the email, Friedman complained that Playboy's executives "screwed up the cigarette deal through self[-]dealing."  Friedman claimed that Playboy representatives had "bragged" that the contemplated cigarette deal would have brought $20 million to $30 million per year in licensing fees, a percentage of which Friedman claimed he owned "through a Singapore company."  As to the contemplated beer deal, Friedman complained that Playboy wrongfully froze out Friedman's company in order to work directly with sub-licensors.  Friedman complained that "[l]osing major money because of the reckless and grossly negligent actions of [Playboy] executives McNabb and Nordby [did not] sit well with [him].  The Playboy Breweries investment was real, and the business was solid, . . . and the Playboy cigarette . . . contract was worth a billion dollars."  Friedman closed by stating:  "I will be in LA from May 7th forward, as I am moving back from China.  We can meet to review documents, emails, etc. with or without outside counsel.  Please make sure that you keep all the emails needed to review on your side from all current/past executives and Board members."

On May 10, 2016, Friedman emailed Sagan again.  This email (the subject email) provides in full:

"Hi Rachel:  [¶]  I agree that all business has potential risks. [¶] Unfortunately, the inexcusable actions of Michael McNabb and Matt Nordby while working as senior executives at [Playboy],

4

killed two businesses which were well underway and widely acknowledged to be extremely valuable. Their negligent behavior caused significant damage to [Playboy] but also to myself. [¶] I spoke with my long time lawyer, Robert O'Brien (Larsonobrienlaw.com), and he suggests you and I sit down alone to see if we can come to a meeting of the minds. While working with Robert is great, and a billion dollar damages trial is interesting, challenging and should be successful, I would rather focus at this point of my life on settling the issues and just getting compensated for my investment (cash and time) in Playboy Breweries and Playboy Lifestyle (cigarettes with HH). [¶] Let[']s just the two of us meet for now—I am available Thursday/Friday at your office in West LA or Larson O'Brien offices downtown."

Sagan responded via a May 13, 2016 email, in which she noted: "While we appreciate your lawyer's suggestion, we are struggling to understand what type of business solution you are contemplating out of your litigation-oriented messages. [¶] Because you have chosen to use adversarial allegations and claims as the foundation of your outreach, it would make more sense to have each of our lawyers in the room for a discussion. [¶] Our counsel, Michael Eisner, and I are available to meet Robert and you on Thursday, June 2, at 11[:00 a.m.] in Michael's office. Let me know if that works and, if not, suggest alternate dates/times."

Friedman met with Sagan and Playboy's outside counsel in June 2016. According to both Friedman and Playboy, at that meeting, Friedman "repeatedly" told Playboy that he "had no intention of making any claim against [it] at that time," and that if he ever were to make a claim, he "would only do so through [his] lawyer, Robert O'Brien." Also, according to both Friedman and Playboy, Friedman indicated at this meeting that he "wanted to

figure out a future business arrangement with Playboy." At the end of the meeting, Friedman told Playboy he would provide more information about his concerns regarding their prior business dealings, but never did so.

### 2. *Communications during the policy period regarding the Friedman-Playboy dispute*

On March 14, 2017, Playboy received a letter from Friedman's lawyer, Robert O'Brien. In it, O'Brien stated that the Friedman-affiliated company involved in the cigarettes venture, Playboy Lifestyle, had retained Larson O'Brien, and that the company "intend[ed] to initiate legal proceedings" against Playboy. The letter identifies four causes of action—breach of contract, breach of the duty of good faith and fair dealing, fraud, and negligence—and described in detail the basis for each. In this context, the letter also identifies specific purportedly wrongful acts by the two Playboy executives who Friedman had described in the subject email simply as having been "negligent." The letter further represents that the relevant law is that of the People's Republic of China, pursuant to a choice-of-law provision in the agreement related to the cigarette venture. The letter indicates Playboy Lifestyle had incurred monetary damages "exceed[ing] $227,400,000," and "demands that Playboy pay $95,000,000 as settlement for Playboy's bad faith conduct which resulted in its failure to perform under the collaboration contract." (Boldface and capitalization omitted.)

In December 2017, O'Brien sent Playboy another letter similar in structure to the May 2017 letter. In it, O'Brien indicated that another Friedman-affiliated company, Eight Cup, had retained O'Brien "in connection with [Playboy's] breach" of the agreement regarding the breweries venture. The December 2017 letter identifies four causes of action—breach of contract, "breach of fiduciary duty against a director," "inducing breach of contract,"

6

and "misappropriation of trade secrets"—and describes in detail the basis for each. (Boldface and capitalization omitted.) It indicates Eight Cup "intend[ed] to initiate legal proceedings" under Hong Kong law and in a Hong Kong arbitral forum. The letter also represents that Eight Cup had incurred monetary damages "exceed[ing] $216,000,000," and "demands that Playboy pay $90,000,000 as settlement for Playboy's various breaches." (Boldface omitted.)

Playboy notified Indian Harbor of the March 2017 and December 2017 demand letters. Indian Harbor requested "all written communications bearing on the dispute that predate the March 2017 demand." Playboy initially provided the April 19, 2016 email, but not the subject email. Indian Harbor subsequently agreed to defend Playboy against the claims reflected in the March and December 2017 letters, subject to a reservation of rights, expressly including its right of recoupment.

Playboy ultimately provided Indian Harbor with the subject email as part of a larger production of documents. After receiving it, Indian Harbor advised Playboy that there was no coverage for the dispute,[1] because a claim regarding the dispute was first made via the subject email, and thus before the policy's inception. Indian Harbor did not dispute that the demands were the type of claim covered by the policy. Rather, Indian Harbor denied coverage solely

---

[1] Indian Harbor and Playboy agree that the dispute regarding the contemplated cigarette deal and the dispute regarding the contemplated breweries deal constitute "related matters" under the policy, and thus are the subject of a single claim under the policy. Therefore, in the remainder of our opinion, we will refer to a single dispute between Playboy and Friedman and/or a single claim by Friedman.

7

based on timing. Indian Harbor advised that it nevertheless would participate in mediation and reiterated its reservation of rights.

### 3. *Mediation and settlement*

Indian Harbor ultimately negotiated a settlement with Friedman and his affiliated entities for $5 million. Indian Harbor advised Playboy, and Playboy acknowledged, that Indian Harbor proposed to settle the Friedman dispute subject to the right to recoup all amounts it funded upon a determination that the dispute was not covered.

On October 17, 2018, Indian Harbor paid $4,840,259.97 towards settlement. Playboy paid $159,740.03 towards settlement, the remainder of the policy's $250,000 self-insured retention after the defense costs Playboy incurred.

### C. *Playboy's Coverage Action and Indian Harbor's Cross-complaint*

Playboy filed a coverage action against Indian Harbor, and Indian Harbor filed a cross-complaint. The cross-complaint sought a declaration that the policy did not cover the Friedman dispute because it was first made via the subject email, before the policy's inception. The cross-complaint also sought to recoup the $4,840,259.97 Indian Harbor had paid to settle with Friedman, along with prejudgment interest.

Following discovery, Indian Harbor moved for summary judgment or summary adjudication on both its cross-complaint and Playboy's complaint. Playboy did not move for summary judgment or adjudication.

The court made several evidentiary rulings in connection with the motion, including sustaining Playboy's hearsay, relevance, and foundation objections to Sagan's May 13, 2016 email in response to the subject email.

8

On the merits, the court concluded that the subject email was not a claim under the policy, and that a claim regarding the Friedman dispute was first made during the policy period, via the March 2017 demand letter. Specifically, the court explained that, in the subject email, "the only thing Friedman requested was a meeting, and Friedman explicitly stated that he preferred to sit down 'alone' without the presence of attorneys. . . . While Friedman called the idea of a trial 'interesting,' he did not request 'monetary damages, services, or injunctive or other non-monetary relief,' nor did he insist on any course of action. [¶] Moreover, while the email does not foreclose the possibility of litigation, Friedman's email . . . does not express a clear intent to sue if an appropriate settlement cannot be reached."

On this basis, the court denied in part Indian Harbor's motion for summary adjudication.[2] To facilitate this appeal, the parties filed a motion for stipulated judgment, dismissing the remainder of the claims in the complaint and cross-complaint without prejudice. The court granted the motion, and Indian Harbor timely appealed.[3]

---

[2] The trial court granted summary adjudication in Indian Harbor's favor on Playboy's claims alleging Indian Harbor's handling of settlement negotiations constituted a breach of contract and bad faith. Neither party challenges those rulings on appeal.

[3] In the absence of an agreement to toll the statute of limitations for the causes of action the parties dismissed without prejudice, the stipulated judgment is appealable. (See *Kurwa v. Kislinger* (2013) 57 Cal.4th 1097, 1105–1106.) The record does not contain any reference to a tolling agreement. At the hearing before this court, counsel for both parties affirmed that no such agreement exists.

## DISCUSSION

The single issue Indian Harbor raises on appeal is whether the trial court erred in concluding the subject email was not a "claim" under the policy. The interpretation of the policy and its application to undisputed facts—here, for example, the undisputed contents of the relevant emails—are issues we review de novo. (*Westrec Marina Management, Inc. v. Arrowood Indemnity Co.* (2008) 163 Cal.App.4th 1387, 1391 (*Westrec*).) For reasons we outline below, we hold the trial court correctly concluded the subject email was not a claim.[4]

### A. *On Its Face, the May 2016 Friedman Email Is Not a "Claim" Under the Policy*

We interpret insurance policies using ordinary contract interpretation principles. (*Montrose Chemical Corp. of California v. Superior Court* (2020) 9 Cal.5th 215, 230; *Palmer v. Truck Ins. Exchange* (1999) 21 Cal.4th 1109, 1115.) Interpretation begins with the plain language of the policy. (*Montrose, supra*, at pp. 229−230.) If that language " ' " 'is clear and explicit, it governs.' " ' " (*Id.* at

---

[4] In its arguments on appeal, Indian Harbor relies on Sagan's May 13, 2016 email, which the court excluded, and notes in a footnote why the email was admissible. This is insufficient to raise an appellate challenge to the court's exclusion of the document. (See *Hall v. Department of Motor Vehicles* (2018) 26 Cal.App.5th 182, 193 [footnoted arguments not identified in a separate heading are forfeited]; Cal. Rules of Court, rule 8.204(a)(1)(B) [points must be stated "under a separate heading or subheading summarizing the point," and be supported by "argument and, if possible, by citation of authority"].) Even if Indian Harbor had sufficiently raised the issue, however, and even assuming the court incorrectly excluded Sagan's email, considering this email would not affect our analysis or disposition of the instant appeal as set forth below.

10

p. 230.) "We consider the contract as a whole and construe the language in context, rather than interpret a provision in isolation. (Civ. Code, § 1641.) . . . If contractual language is clear and explicit and does not involve an absurdity, the plain meaning governs. (*Id.*, § 1638.)" (*Westrec, supra*, 163 Cal.App.4th at p. 1392.)

Here, the policy defines four types of "claim[s]," only one of which Indian Harbor argues applies to the subject email: "[a] written demand for monetary damages, services, or injunctive or other non-monetary relief." The policy does not define "demand," so we look to the " 'ordinary and popular' definition" of this term. (*AIU Ins. Co. v. Superior Court* (1990) 51 Cal.3d 807, 825; *Westrec, supra*, 163 Cal.App.4th at pp. 1391–1392.) Applying this approach, *Westrec*, the primary case on which Indian Harbor relies, addresses the meaning of the term "demand" when it appears in an insurance contract's definition of "claim" similar to the definition in the policy at issue here. (*Westrec, supra*, 163 Cal.App.4th at p. 1392 [interpreting the following definition of "claim": " 'a written demand for civil damages or other relief commenced by the [i]nsured's receipt of such demand' "].) In that context, *Westrec* defines "demand" as "a request for something under an assertion of right or an insistence on some course of action." (*Ibid.*; see also *Abifadel v. Cigna Ins. Co.* (1992) 8 Cal.App.4th 145, 160 ["[i]n both its ordinary meaning and in the interpretation given to it by other courts in similar circumstances, a claim is a demand for something as a right or as due"].)

### 1. *The subject email does not contain a "demand"*

The subject email does not contain a "demand." Rather, it contains a description of Friedman's "grievance" and an "expression of [Friedman's] dissatisfaction" with the behavior of certain Playboy executives—each of which, under the guidance in *Westrec*, is "not

11

a demand." (*Westrec, supra*, 163 Cal.App.4th at p. 1392.) The subject email does go on to make a *request* based on this grievance; specifically, it suggests, "Let[']s just the two of us meet for now." But it neither insists on any course of action, nor expresses an entitlement to any course of action.

Nor is the email's language that Friedman "would rather focus at this point of my life on settling the issues and just getting compensated for my investment (cash and time)" a "demand" for such compensation, because it does not request the compensation referenced, let alone "insist[ ]" on it or claim Playboy owes it to Friedman as a matter of right.

### 2. *The subject email does not request monetary compensation or "other non-monetary relief" a court could award*

Even assuming, for the sake of argument, that the letter contained a "demand," the email still would not constitute a claim, because it still would not contain a demand "for *monetary damages, services, or injunctive or other non-monetary relief.*" (Boldface omitted & italics added.) A meeting is obviously not monetary damages. (See *Catlin Specialty Ins. Co. v. CAMICO Mut. Ins. Co.* (N.D.Cal. 2012) 896 F.Supp.2d 808, 819−820 [insured's letters to insurer referencing insurer's breach of duty, urging it to settle third party's lawsuit against the insured, and pointing out insurer's risk if it did not settle, was not a "claim" because insured did not "make a demand for extracontractual monetary damages"].) Nor does (or could) Indian Harbor argue that a meeting with Playboy constitutes "injunctive or other non-monetary relief," such that the email might still meet the definition of "claim" by demanding such relief. In the policy, the term "relief" appears in the context of a definition of "claim" that employs terminology customarily used to describe formal or quasi-formal litigation or litigation events, including

12

the word "claim" itself, "civil proceeding," "subpoena," and "injunct[ion]." In this context, the "plain meaning" of "relief" would fairly be the meaning pertinent to such legal matters: namely, redress that can be ordered by a court. (Merriam-Webster Dict. Online (2022) <https://www.merriam-webster.com/dictionary/relief> [as of Oct. 1, 2022] [defining relief as "legal remedy or redress"]; Black's Law Dict. (11th ed. 2019) [defining relief as, inter alia, "[t]he redress or benefit, [especially] equitable in nature (such as an injunction or specific performance), that a party asks of a court"].)

### 3. *Indian Harbor's arguments regarding implicit threats of litigation*

Indian Harbor argues the subject email implicitly threatens litigation, and thus that the email's request for a meeting is more akin to a request for a *settlement* meeting, rendering it an implicit demand for a settlement payment "[l]ike the demand in *Westrec*." We disagree.

The "claim" at issue in *Westrec* was a letter from an attorney representing the potential plaintiff employee to her employer that referenced a Department of Fair Employment and Housing right-to-sue letter the employee had procured, which the Court of Appeal noted is a prerequisite to suing under the Fair Employment and Housing Act. (*Westrec, supra*, 163 Cal.App.4th at p. 1392.) The attorney letter then asked whether the employer " 'would prefer to attempt to resolve or mediate this matter, or if it will be necessary to file a lawsuit and have a jury decide the outcome.' " (*Id.* at p. 1390.) The letter went on to explain that " '[i]t is often in an employer's best interests to resolve discrimination claims promptly' " to avoid paying mandatory statutory attorney fees after trial, and urged the employer to " 'do the right thing' " by " 'rectify[ing] the [employee's] harm' " " 'confidential[ly] and discreet[ly]' " " '[b]efore any litigation becomes necessary.' " (*Ibid*.)

13

This language, combined with the reference to the right-to-sue letter immediately preceding it, led the Court of Appeal in *Westrec* to conclude that the employee's attorney had "clearly expressed [the employee's] intent to sue [the employer] for employment discrimination if an appropriate settlement could not be reached"— even though the letter did not expressly so state. (*Id.* at p. 1392.) Therefore, the attorney letter constituted a "demand" for monetary damages and a "claim" under the policy at issue in *Westrec*.

Unlike the letter in *Westrec*, there is no additional context in the subject email that would allow us to interpret the email requesting a meeting as even an indirect request for settlement compensation. For example, the *Westrec* letter, unlike the subject email, expressly states that litigation may become necessary, and describes affirmative steps, including jurisdictional exhaustion of administrative remedies, the employee had already taken towards being able to file suit. The subject email's opaque reference to litigation—specifically, how Friedman does *not* want to pursue it, even though he believes he would prevail—is distinguishable from the discussion of litigation in the *Westrec* letter in this and other respects.

Our conclusion that the subject email does not constitute a claim is further supported by the fact that, ultimately, Friedman alone did not initiate arbitration proceedings regarding the dispute, but rather Friedman and the entities that were the actual parties to the agreements regarding the failed ventures. Particularly when considered in this context, Friedman's expression of dissatisfaction with how the ventures ended, and his vague reference to particular executives being "negligent," is a far cry from a specific assertion of right under agreements to which, it appears from the record, Friedman was not a party.

14

**B.** ***Indian Harbor's Reliance on Unpublished Federal Authority Is Unavailing***

In arguing to the contrary, Indian Harbor also relies on several unpublished federal cases.  These cases are not binding on this court.  (See *Walker v. Apple, Inc.* (2016) 4 Cal.App.5th 1098, 1108, fn. 3 (*Walker*); *City of Hawthorne ex. rel. Wohlner v. H&C Disposal Co.* (2003) 109 Cal.App.4th 1668, 1678, fn. 5.)  Moreover, even if we were to consider these decisions, the subject email is distinguishable from the communications at issue in them, so they are not even persuasive authority supporting Indian Harbor's arguments.  (See *Walker, supra,* at p. 1108, fn. 3 [unpublished federal authority has no precedential value, but may be cited as persuasive].)

For example, Indian Harbor cites *Pacific Coast Surgical Center LP v. Scottsdale Ins. Co.* (C.D.Cal. June 25, 2019, No. CV-18-3904 PSG (KSx)) 2019 WL 4390565, in which the letter the court concluded was a "claim" proposed particular types of monetary compensation and non-monetary relief—"that [the insured] purchase [the potential plaintiff's] partnership interest [in a partnership between the insured and the potential plaintiff] at full market value" or that the insured "release [the potential plaintiff] from the non-compete provision" in that agreement.  (*Id.* at p. *2.)  The letter also indicated the plaintiff would be " 'willing to attempt to settle [the] matter informally' " before " 'submitting [it] to mediation' " pursuant to a section of the partnership agreement that required the parties to mediate before filing suit.  (*Ibid.*)  The court concluded that, by both (1) requesting monetary compensation and non-monetary legal relief; and (2) indicating an intent to move towards litigation if settlement could not be reached, the letter conveyed a clear message:  " '[S]ettle now, or we are going to court.' "  (*Id.* at p. *6.)  That message constitutes an insistence on

15

relief of the type a court could issue, and thus meets the definition of a claim.  But no such message can be gleaned from the subject email.

Indian Harbor also cites *Peachstate Health Management LLC v. Chubb Insurance Company of New Jersey* (C.D.Cal. Nov. 24, 2020, No. CV-19-8175 DSF (SPx)) 2020 WL 8184143, which distinguishes itself from the instant case in that it expressly stated that the violations of law identified created claims that " 'need[ ] to be settled' " through a monetary payment.  (*Id.* at p. *4.) Specifically, the letter at issue was from an employee to her employer (the insured) describing the employer's conduct towards the employee as " 'a violation of Illinois law not to mention federal employment law.' " (*Ibid.*)  The letter went on to "discuss[ ] when [the employee] [would] 'have [her] day in court' and request . . . that '[her] individual claim against [the employer] for . . . sexual assault, harassment, and retaliation needs to be settled.  The amount will be in the high seven figures.' " (*Ibid.*)  Thus, the letter involved an insistence on monetary damages.  The subject email does not.

Indian Harbor also cites *Presidio Wealth Management, LLC v. Columbia Casualty Company* (N.D.Cal. Apr. 3, 2014, No. 13 CV-04604-WHO) 2014 WL 1341696 (*Presidio*), which involved an email containing demands that " '[the insured] must make [the potential plaintiff] whole by buying [him] out [of an investment], forcing redemption of the [auction rate preferred securities] or deliver[ing] on an acceptable sale.' " (*Id.* at p. *7.)  Forced redemption constitutes a form of non-monetary relief a court might offer, and being "bought out" of an investment is tantamount to monetary relief.  The subject email, by contrast, does not ask for any form of monetary damages or non-monetary "relief"—let alone insist that Playboy "must" provide such relief.

16

Indian Harbor emphasizes that, like the subject email, the email at issue in *Presidio* does not specifically threaten litigation, but rather presents the potential plaintiff's requests as based on a preexisting right or obligation, by stating that" 'it is your responsibility to get me out [of this investment].' " (*Presidio, supra,* 2014 WL 1341696 at p. *3; see *Westrec, supra,* 163 Cal.App.4th at p. 1392 [demand is "a request for something under an assertion of right or an insistence on some course of action"].) Indian Harbor argues this is akin to the subject email's reference to Friedman likely prevailing in a civil damages trial, which implies he is legally entitled to something from Playboy. But the email in *Presidio,* unlike the subject email, also includes clear directive language ("must"). Moreover, even if we were to conclude that the subject email contains an insistence on something or an assertion of right to something, the subject of such demands still would not constitute "damages" nor "other non-monetary relief," as required by the policy's definition of "claim."

## C. *We Need Not Rely on Extrinsic Evidence Regarding the Meaning of the May 2016 Friedman Email*

Finally, we decline Playboy's invitation that we consider testimony regarding Friedman and Playboy's respective understandings of the subject email in determining whether or not the email is a claim. We need not rely on this evidence in reaching the conclusion for which Playboy advocates, because the language of the subject email permits no interpretation except that it is not a claim. For these same reasons, even if we were to consider Sagan's email response to the subject email (see *ante,* fn. 4), we would still conclude that the subject email is not a claim.

17

## DISPOSITION

The judgment is affirmed.  Respondent is awarded its costs on appeal.

NOT TO BE PUBLISHED.

ROTHSCHILD, P. J.

We concur:

BENDIX, J.

KELLEY, J.*

---

* Judge of the Los Angeles County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.